UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RICHARD WEST,

                         Plaintiff

-vs-

THE CORNING INCORPORATED PENSION
PLAN FOR HOURLY EMPLOYEES,

                         Defendant

DECISION AND ORDER

08-CV-6230 CJS

_____

APPEARANCES

For Plaintiff:               Shawn M. Sauro, Esq.
                           Learned, Reilly, Learned & Hughes, LLP
                           449 East Water Street
                           P.O. Box 1308
                           Elmira, New York 14902

For Defendant:          Thomas E. Reidy, Esq.
                           Tony R. Sears, Esq.
                           Ward Norris Heller & Reidy LLP
                           300 State Street, Sixth Floor
                           Rochester, New York 14614

INTRODUCTION

This is an action to recover long-term disability insurance benefits, brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. Plaintiff, who claims to be disabled due to leukemia and depression, contends that Defendant's decision denying him benefits was arbitrary and capricious. Now before the Court is Defendant's motion for summary judgment (Docket No. [#9]) and Plaintiff's cross-motion for summary judgment (Docket No. [#11]). For the reasons that follow, Defendant's

application is denied, Plaintiff's application is granted, and this matter is remanded for further proceedings.

BACKGROUND

The issue presented in this case is whether Defendant arbitrarily and capriciously denied Plaintiff long-term disability benefits. Under the relevant plan, Plaintiff was entitled to receive such benefits if he had a "Total and Permanent Disability" ("TPD"), defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long, continued and indefinite duration." (West 0205).[1] On this point, the following are the relevant facts of the case, about which there is little dispute.

Between 1978 and July 2003, Plaintiff was employed by Corning as a Skilled Machine Operator.[2] At all relevant times, Defendant maintained the Corning Incorporated Pension Plan for Hourly Employees ("the Plan"), which was an employee benefits plan governed by ERISA. Plaintiff was an hourly employee who was covered by the Plan. As mentioned above, the Plan provided long-term disability benefits to employees with a TPD. The Plan also granted the Plan Administrator discretion to "determine all questions relating to . . . the eligibility of persons to receive benefits [under the Plan]." (West 0276-0277). The Corning Incorporated Benefits Committee ("the Committee") was the Plan Administrator. However, the Committee delegated its authority to a third-party corporation, CORE, INC., whose Peer Review Analysis division was in turn acquired by another entity, MCMC, LLC

---

[1]Unless otherwise noted, citations are to Defendant's Appendix to Local Rule 56.1 Statement of Material Facts.

[2]In addition to many other requirements, that job involved sitting, standing, and walking, each of which was performed during "20% - 60% [of the] working day." (West 0043).

("MCMC"). Consequently, MCMC assumed the role of claims administrator for long-term disability claims under the Plan. For the sake of convenience, and except as otherwise noted, in this Decision and Order the Court will refer to the Committee, CORE, and MCMC, collectively, as "the Committee."

The Plan provided a mechanism for claimants to appeal adverse determinations. Specifically, Section 9.3 of the Plan, Amendment No. 3 to July 1, 2000 Restatement, entitled "Total and Permanent Disability Claims Review Procedure," set forth a detailed procedure involving an initial determination and two levels of appeals. The relevant portions of the provision are as follows:

> If a claim for benefits is denied, in whole or in part, a Participant or Beneficiary . . . will receive a written notice of the denial. The notice will be written in a manner calculated to be understood by the Participant or Beneficiary and will include:
>
> 1. the specific reason(s) for the denial,
> 2. references to the specific Plan provisions on which the benefit determination was based,
> 3. a description of any additional material or information necessary to perfect a claim and an explanation of why such information is necessary,
> 4. a description of the Plan's appeals procedures and applicable time limits, and
> 5. a statement regarding the right to obtain upon request and free of charge, a copy of internal rules or guidelines relied upon in making this determination, and if the determination is based on medical necessity or experimental treatment or similar exclusion limit, an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the relevant medical circumstances.
>
> If a claim for benefits is denied, a Participant or Beneficiary . . . may appeal the denied claim in writing within 180 days of receipt of the written notice of denial. The Participant or Beneficiary may submit any written comments, documents, records and any other information relating to the claim. Upon request, the Participant or Beneficiary will also have access to, and the right to obtain copies of, all documents, records and information relevant to his or her claim free of charge.

A full review of the information in the claim file and any new information submitted to support the appeal will be conducted. The claim decision will be made by individuals who were not involved in the initial benefit determination, nor will such individuals be subordinate to any person involved in the initial benefit determination. This review will not afford any deference to the initial benefit determination.

If the initial adverse decision was based in whole or in part on a medical judgment, the Committee will consult with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment, was not consulted in the initial adverse benefit determination and is not a subordinate of the healthcare professional who was consulted in the initial adverse benefit determination.

***

If the claim on appeal is denied in whole or in part, a Participant or Beneficiary will receive a written notification of the denial. The notice will be written in a manner calculated to be understood by the claimant and will include:

1. the specific reason(s) for the adverse determination,
2. references to the specific Plan provisions on which the determination was based,
3. a statement regarding the right to receive upon request and free of charge reasonable access to, and copies of, all records, documents and other information relevant to the benefit claim,
4. a description of the Plan's review procedures and applicable time limits, and
5. a statement [that] the claimant has the right to obtain upon request and free of charge, a copy of the internal rules or guidelines relied upon in making this determination, and if the determination is based on medical necessity or experimental treatment or similar exclusion or limit, an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the relevant medical circumstances.

If the appeal of the benefit claim denial is denied, a Participant or Beneficiary . . . may make a second appeal of the denial in writing to the Committee within 180 days of the receipt of the written notice of denial. The Participant or Beneficiary may submit with the second appeal any written comments, documents, records and any other information relating to the claim. Upon request, the Participant or Beneficiary will also have access to, and the right to obtain copies of, all documents, records and information relevant to the claim free of charge.

Upon receipt of a second appeal, the Committee will conduct a full review of the claim file and any additional information submitted. The claim decision will be made by the Appeals Review Unit. The Appeals Review Unit would

not have been involved in the initial benefit determination or in the first appeal and will not have been the subordinate of either the Plan Administrators or the Appeals Unit.

If the first appeal was based in whole or in part on a medical judgment, the Appeals Review Unit will consult with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment, was not consulted in the initial adverse benefit determination nor in the first appeal and is not a subordinate of the healthcare professional(s) consulted in the initial adverse benefit determination and first appeal.

***

If the claim on appeal is denied in whole or in part for a second time, the Participant or Beneficiary will receive a written notification of the denial. The notice will be written in a manner calculated to be understood by the applicant and will include the same information that was included in the first adverse determination letter and a statement of right to bring an action under ERISA.

(West 0267-0269).

On or about June 1, 2001, Plaintiff began treating with his primary care physician, Robert Stewart, M.D. ("Stewart"). On that date, Stewart reported that Plaintiff was complaining of panic attacks and depression, for which Plaintiff's previous doctor had prescribed Celebrex, Buspar and Xanax. (West 0105). Plaintiff told Stewart that Xanax was the only medication that helped him, and that his previous doctor had refused to continue prescribing Xanax. *Id*. Stewart's impression was "depression and probable panic attacks," and he prescribed Xanax and Effexor in addition to Buspar, and discontinued Celebrex. *Id*. On June 25, 2001, Stewart saw Plaintiff again, at which time Plaintiff stated that he was doing "pretty well," and taking Xanax only occasionally. (West 0106). On August 21, 2002, Stewart reported that Plaintiff was "doing well in regards to his depression and panic." (West 0108). Plaintiff informed Stewart that he had been out of work for approximately one year, due to depression and anxiety, but felt well enough to return to work. *Id*. Stewart cleared Plaintiff to return to work. *Id*. ("I certainly think this is reasonable

and actually would have returned him to work sooner than now had I know he was not working.").

Approximately one year later, in July 2003, Plaintiff again stopped working. Apparently, this was due to a combination of symptoms involving depression and physical symptoms resulting from as-yet-undiagnosed leukemia. (West 0045).

On or about October 4, 2003, Plaintiff was involved in a motor vehicle accident and received treatment at a hospital emergency room. During the course of such treatment, diagnostic testing raised the possibility of cancer. Plaintiff followed-up with an Oncologist, William T. Muuse, M.D. ("Muuse"), who diagnosed Plaintiff as having chronic lymphocytic leukemia. Muuse began administering chemotherapy. Subsequently, in October 2003, Plaintiff developed blood clots in his lungs and his left leg, which Muuse successfully treated with anticoagulation medication.

On October 16, 2003, Plaintiff filed for Social Security Disability Insurance benefits ("SSDI"), claiming that on July 10, 2003, he became unable go work due to "severe mental health issues and chronic lymphocytic leukemia." (West 0045).

On October 23, 2003, Muuse completed a report, apparently in connection with Plaintiff's application for short-term disability benefits, stating that Plaintiff was totally disabled at that time, as a result of having chemotherapy treatments five times per week. (West 0138). Muuse estimated that Plaintiff would be able to return to work in October 2004. *Id*.

On October 24, 2003, also apparently in connection with Plaintiff's application for short-term disability benefits, Sheikh Qadeer, M.D. ("Qadeer"), a psychiatrist with whom Plaintiff began treating in July 2003, completed a medical report, stating that Plaintiff was

totally disabled at that time, due to depression and anxiety. (West 0139). Qadeer stated that Plaintiff "has been very depressed and has been tired and anxious – has lymphocytic leukemia." *Id*. As to whether Plaintiff would be able to return to work, Qadeer wrote, "unknown." *Id*.

On January 5, 2004, Plaintiff was examined by John Thomassen, Ph.D. ("Thomassen"), a non-treating state agency consultant, who conducted a psychiatric evaluation. (West 0087-0090). Plaintiff told Thomassen that three years earlier, he had been hospitalized for two weeks for treatment of depression, and that he was currently being treated by a psychiatrist. Specifically, Plaintiff stated that he was taking medication, Lexapro and Trazodone, and receiving counseling approximately twice per month. Plaintiff also stated that he stopped working in August 2003 due to depression. Plaintiff further stated that he was often sad and anxious, and that he avoided crowds and retail stores. Plaintiff reported having panic attacks periodically for three years, and stated that two weeks earlier he had experienced a panic attack in shopping mall. Plaintiff said that his panic attacks involved feeling hot and nervous, with rapid breathing, and typically lasted for a few minutes or until he left the situation. (West 0088). Additionally, Plaintiff indicated that he was often distracted and indecisive. Thomassen observed, in relevant part, that: 1) Plaintiff's though processes were coherent and goal directed; 2) Plaintiff's attention, concentration, and memory were intact; 3) Plaintiff's cognitive functioning was average and his insight and judgment were good; and 4) Plaintiff's affect was broad with occasional sadness. (West 0089). Thomassen stated that Plaintiff "should be able to perform rote tasks and follow simple directions. He may be able to perform complex tasks consistent with his skill level. He is likely to have some problems relating with coworkers and coping

7

with stress." *Id.* Thomassen observed that Plaintiff's "[a]llegations of psychiatric disability were somewhat consistent with [his] examination findings." (West 0090). Thomassen's prognosis was "somewhat guarded, given the ongoing stressors of [Plaintiff's] cancer and chemotherapy treatment, as well as his past history of depressive episodes and alcohol dependence." *Id.*

On February 13, 2004, P.A. Spearman, Ph.D. ("Spearman"), a state disability agency psychologist, completed a Psychiatric Review Technique form in connection with Plaintiff's application for SSDI benefits. (West 0155-0166). Spearman's report indicates that it was based primarily, if not exclusively, on Thomassen's report. (West 0158, 0160, 0163).[3] Spearman indicated that Plaintiff would have moderate limitations in maintaining social functioning and mild limitations with regard to activities of daily living and maintaining concentration, persistence or pace. (West 0165). Also on February 13, 2004, Spearman completed a Mental Residual Functional Capacity Assessment form, in connection with Plaintiff's application for SSDI benefits. (West 0172-0174). Spearman stated that Plaintiff was moderately limited with regard to understanding and remembering detailed instructions, carrying out detailed instructions, performing activities within a schedule, maintaining regular work attendance, completing a normal workday without interruptions form psychologically-based symptoms, accepting criticism and instruction, and responding to changes in the work setting. (West 0172-0173).

_____

[3]Plaintiff's papers indicate that he was examined by Spearman. However, the Court doubts that, and observes that Spearman's reports contain no mention of having examined Plaintiff. Instead, Spearman's reports appear to merely summarize and paraphrase Thomassen's report. Moreover, as discussed below, the Social Security Administration Administrative Law Judge in Plaintiff's case referred to Spearman as a "state agency review physician," and in the Court's experience, such review physicians base their opinions solely on their review of the medical file.

On April 8, 2004, in connection with Plaintiff's application for SSDI benefits, Muuse completed a report, stating that Plaintiff "could lift or carry less than 10 pounds occasionally, [and] stand or walk less than 2 hours in an 8-hour day and sit less than 6 hours in an 8-hour day," and that such limitations would likely persist "at least until October 2004." (West 0167-0170). Muuse further stated that Plaintiff could occasionally reach, handle, finger, and feel. (West 0169). The report appears to indicate that such restrictions would remain in effect until October 1, 2004. (West 0168).

On April 21, 2004, the Social Security Administration ("SSA") granted Plaintiff's application for disability benefits. The SSA found that Plaintiff suffered from "chronic lymphocytic leukemia, status-post deep venous thrombosis and pulmonary embolism, panic disorder and major depressive disorder," which conditions could be expected to result in death or last for at least twelve months, and which prevented Plaintiff from engaging in any substantial gainful activity. (West 0045). In making that determination, the SSA relied on medical information that was compiled in or before April 2004. For example, the SSA relied on Muuse's report from April 8, 2004. (West 0046). The SSA also credited the portion of Thomassen's report from January 2004 which indicated that Plaintiff "would likely have problems relating to coworkers and coping with stress due to moderate recurrent major depression and panic disorder." (West 0046). The SSA also placed great weight on the opinions of a "state agency review physician," referring to Spearman, who opined that Plaintiff "would have moderate limitations in understanding, remembering and carrying out detailed instructions, performing work activities within a schedule, completing a normal workday and workweek without interruptions from psychologically based symptoms, accepting instructions and responding appropriately to criticism from supervisors and

responding appropriately to changes in the usual work setting." (West 0046). To summarize, the SSA found, based on the reports by Muuse, Thomassen, and Spearman, that Plaintiff's physical and mental impairments prevented him from doing any type of work.

On June 2, 2004, Muuse completed a Corning disability claim report, stating that Plaintiff was, at that time, "totally disabled for any occupation." (West 0050). Muuse's opinion that Plaintiff was presently unable to work was related solely to Plaintiff's leukemia condition, and Muuse indicated that Plaintiff had no psychological problems that would interfere with his ability to work. (West 0052). Muuse further noted, however, that Plaintiff had completed chemotherapy, and that his condition was improving. (West 0050-0051). In that regard, Muuse estimated that Plaintiff would be able to return to work in October 2004. Plaintiff, though, apparently did not share Muuse's optimism, since on or about June 11, 2004, he stated on a disability form that he was "not expected to return" to work. (West 0055).

On June 11, 2004, Plaintiff applied for long-term disability benefits under the Plan. (West 0023, 0059). When asked to state "the cause of your disability," Plaintiff responded "chronic lymphocytic leukemia," without mentioning any mental health issue. (West 0059). Plaintiff, though, did list Qadeer as one of his treating physicians. *Id*.

On June 21, 2004, the Committee began consideration of Plaintiff's application. The record does not indicate the identity of the Committee members. The Committee referred Plaintiff's application to Dr. Marciniak ("Marciniak"), an independent physician board-certified in internal medicine and oncology, for peer review. (West 0060, Defendant's Statement of Facts ¶ 28). The Committee's referral to Marciniak included Muuse's contact information. (West 0060). On June 25, 2004, Marciniak spoke with Muuse, who stated that:

1) Plaintiff was in good partial remission from leukemia and was not currently being treated;

2) Plaintiff's Eastern Coooperative Oncology Group ("ECOG") performance status was "0,"

meaning that in Muuse's opinion Plaintiff's level of functioning was not affected by the

leukemia; and 3) Plaintiff would remain on anticoagulation medication indefinitely, due to

his history of blood clots. (West 0062). Muuse further stated, however, that he expected

Plaintiff's leukemia would "soon progress." *Id.* Marciniak concluded that although the anti-

coagulation medication would "somewhat restrict" Plaintiff's activities, Plaintiff was able to

engage in substantial gainful activity.[4]

On June 28, 2004, the Committee denied Plaintiff's application for long-term benefits.

Plaintiff appealed and submitted a copy of "SSD findings." The Committee referred the

matter to a second independent peer review physician, James E. Wortman, M.D.

("Wortman"), who was board-certified in internal medicine and medical oncology. (West

0070-0071). In conducting his review, Wortman purportedly spoke with Muuse and

reviewed Plaintiff's "appeal letter, benefits handbook, and submitted clinical information."

Wortman concluded, in relevant part, that

> [t]his patient, according to his physician has an ECOG performance status as
> 0. This means that this patient's level of functioning has not been affected by
> his disease (in the treating oncologist's opinion). The patient will continue to
> have chronic lymphocytic leukemia (clinical stage B) and has a median
> survival of about seven years. At some point, he may require additional
> treatment, and at some point, he may become disabled, but that is not the
> case at the present time. The only thing that may limit minimally some of this
> patient's duties would be his chronic anticoagulation for his deep venous
> thrombosis, but up to this point, he has only been minimally impacted by his
> illness.

---

[4]Marciniak purportedly based his opinion on the referral form, the Plan language, his conversation with Muuse, and "submitted clinical highlights." From Marciniak's "Clinical Summary," which contains specific references to Plaintiff's medical history, it appears that he reviewed Plaintiff's oncology records, at least covering the period between the diagnosis of leukemia and the date of his report. (West 0062).

(West 0070).  On July 26, 2004, the Committee notified Plaintiff that it was denying his claim.  (West 0064-0065).

On or about August 3, 2004, Plaintiff submitted a second appeal.  On November 17, 2004, the Committee informed Plaintiff that it was placing his appeal on hold, as a result of learning that Plaintiff had been approved for SSDI benefits based on depression. (West 0010).  The Committee directed Plaintiff to "forward all available records pertaining to the diagnosis of depression." *Id*.   On March 8, 2005, in response to a telephone inquiry from Plaintiff, the Committee again directed Plaintiff to submit all available records concerning his diagnosis of depression. (West 0011).

On May 18, 2005, Qadeer wrote a letter to the Committee.  (West 0095-0096). Qadeer stated that he had been treating Plaintiff since July 2003 for anxiety and depression.  Qadeer stated that Plaintiff was hospitalized for depression three years earlier, and that he subsequently began receiving counseling.  Qadeer noted that Plaintiff had stressors in his life, including marital and financial problems and leukemia.  Qadeer's diagnosis was "[m]ajor depression, recurrent, with anxiety associated with marital problems and medical illness (Leukemia)," for which Plaintiff needed to continue taking Xanax and Lexapro, as well as receiving "supportive and cognitive psychotherapy" every two to four weeks. (West 0096).

On June 7, 2005, the Committee wrote to Plaintiff, acknowledging the receipt of Qadeer's letter, and reiterating that he should submit "all available records concerning [his] diagnosis of depression." (West 0097).  The Committee's letter further stated that, should the Committee "not receive additional information within the next 30 days, there is potential that your application will be denied and closed for lack of sufficient information to review."

*Id.*

On December 23, 2005, Plaintiff was admitted to the hospital with a pulmonary embolism in his right lung. (West 0099-0101). The hospital report noted that Plaintiff had developed chest pain while chopping firewood. (West 0100). Plaintiff was successfully treated with anticoagulation medication for two days and then released. At that time, Plaintiff's leukemia remained in remission. *Id.*

In or about January 2006, Plaintiff sent the Committee Qadeer's office notes covering the period June 15, 2005 through January 18, 2006. The notes, though handwritten and not entirely legible, refer to the following: "limited social life, few friends" (West 0179); "upset as Jamie [girlfriend] left" (West 0180); "anxiety & depression"(*Id.*); "depressed, despondent, cried, anxiety & panic attacks" (West 0183); "upset & depressed" (West 0184).

On February 7, 2006, the Committee wrote to Plaintiff and acknowledged receiving Qadeer's letter dated May 18, 2005, as well Qadeer's office notes. (West 0013). The Committee's letter further acknowledged Plaintiff's most-recent problem with blood clots, and again directed Plaintiff to file any additional records pertaining to his mental and physical ailments. *Id.*

At some point in the appeal process, the SSA sent the Committee a copy of Plaintiff's SSDI claim file. (West 0102-0103).

On or about May 30, 2006, the Committee met to consider Plaintiff's second appeal. According to an undated document entitled "Corning Committee Minutes," contained in Plaintiff's claim file, the Committee consisted of voting members "Dr. Jean Dalpe, Dr. Brian Lisse, Sean Reardon, Diane Schaumberg, and Paul Gilleece. (West 0029). The Minutes indicate that Dr. Dalpe addressed Plaintiff's psychological impairments, and concluded that

13

"there was insufficient information to support disability per plan language." *Id*. The Minutes further state that Dr. Lisse addressed Plaintiff's physical condition, and concluded that Plaintiff was not disabled. *Id*. Additionally, a report entitled "Case Report for Corning,"[5] which Defendant maintains was completed on May 30, 2006, purports to detail Lisse's and Dalpe's evaluation of Plaintiff's claim (West 0352-0355). As part of that report, both Lisse and Dalpe stated, in relevant part, "I have not been involved with the case prior to its referral to me for independent review." (West 0353, 0355). Lisse, who is board certified in internal medicine, found that Plaintiff's leukemia was essentially asymptomatic, and that although Plaintiff had been temporarily disabled by chemotherapy treatments, such treatments ended in October 2004. (West 0352-0353). Dalpe, who is board certified in "psychiatry & neurology/psychiatry," found that Thomassen's report was deficient because it was not supported by "objective data," and that Qadeer's reports "gave no indiction of current functioning" or "data supporting the inability to perform the essential duties of his job, or any other job for which he is qualified." (West 0354). Apparently, Lisse and Dalpe considered Plaintiff's alleged physical and psychological impairments separately, without any consideration of the impairments' combined effect, if any, on Plaintiff's ability to work.

By notice dated May 30, 2006, the Committee issued a "final and binding" decision denying Plaintiff's claim. (West 0015-0016). The notice stated, in relevant part:

> Per Plan language and objective medical review of submitted clinical records and all documentation, the appeals review committee unanimously agreed that you do not meet criteria for total and permanent disability on either a medical or psychiatric basis. There is no indication of disabling symptoms.

---

[5]According to Defendant, the "Case Report for Corning" "records the peer review analysis that was conducted with respect to plaintiff's second appeal." (Reidy Letter dated August 26, 2009).

14

The review committee determined the submitted medical records and all documentation do not show that you meet the definition, stated above, for total and permanent disability. The do not support a total and permanent medical disability. In this case and at the present time, a medical diagnosis is not documented that would disable you from gainful job activity. And, they do not support a total and permanent psychiatric disability. There is no objective data that supports a psychiatric disability. Submitted clinical records include your psychiatric history, but the more current health progress notes do not provide any data to support your inability to perform the essential duties of a job for which you are qualified.

(West 0015). The notice further advised Plaintiff that if he disagreed with the decision, he had the right to commence a lawsuit pursuant to ERISA.

Subsequently, Plaintiff, who had been proceeding without counsel, retained an attorney. Plaintiff's attorney wrote a letter to the Committee, which the Committee interpreted as indicating a desire to appeal the decision through the Plan's appeal process. (West 0020) ("[The Attorney] does not directly state he is appealing, however, it is implied in the letter."). Despite the fact that the May 30, 2006 denial letter indicated that it was "final and binding," the Committee, in its internal deliberations, considered whether to allow Plaintiff to further pursue his claim under the Plan's procedures. (West 0020) ("Corning needs to respond to Attorney Learned's letters and advise whether or not an additional set of reviews (one application and 2 appeals) will be allowed for Richard West, Jr."). Apparently, though, the Committee decided not to allow any further appeals under the Plan.

On May 28, 2008, Plaintiff commenced the subject action. Following discovery, the parties filed the subject motions. On August 20, 2009, counsel for the parties appeared before the undersigned for oral argument of the motions.

DISCUSSION

*Summary Judgment Standard*

15

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable

trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Plaintiff brings this action to recover benefits pursuant to 29 U.S.C. § 1132. With respect to this statute, it is well settled that:

> "[A] denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed [by a district court] under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where the plan does grant discretion to the administrator, a court "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir.1995).

*Tocker v. Philip Morris Companies, Inc.*, 470 F.3d 481, 487 (2d Cir. 2006). Under the arbitrary and capricious standard, the court must uphold the administrator's decision unless it is "without reason or erroneous as a matter of law," and "[w]here the plan participant and the plan administrator offer "two competing yet reasonable interpretations of [the plan]," [the court] must accept that offered by the administrators." *Id*. at 489 (citations omitted); *see also, Anderson v. Sotheby's, Inc.*, No. 04 Civ. 8180 (SAS), 2006 WL 1722576 at *15 (Jun. 22, 2006) (Holding that under the deferential arbitrary and capricious standard of review, "an administrator's decision cannot be disturbed if it is consistent with the terms of the plan, based on consideration of the relevant factors, and supported by substantial evidence.") (citation and internal quotation marks omitted). On the other hand,

[t]he fiduciary's failure to provide a full and fair review can constitute a

decision that was arbitrary and capricious. The purpose of the full and fair review requirement is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts. At its core, the full and fair review requirement includes knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.

*Anderson v. Sotheby's, Inc.*, 2006 WL 1722576 at *18 (citations and internal quotations omitted).

Under ERISA, "[p]lan administrators need not give special deference to a claimant's treating physician," although they cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Paese v. Hartford Life Accident Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006) (citations omitted). Moreover, where a claimant has been found disabled by the Social Security Administration, the court may consider that fact as some evidence of total disability under an ERISA plan. *Id.* ("The court acted well within its discretion when it considered the SSA's findings as some evidence of total disability, even though they were not binding on the ERISA Plan, and even though the SSA's definition of disability may differ from that in the [ERISA] Plan.").

As for a remedy, "if upon review a district court concludes that the Trustees' decision was arbitrary and capricious, it must remand to the Trustees with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'" *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) (citations omitted).

In the instant case, the parties agree that the Court must review the Committee's determination using the arbitrary and capricious standard of review, although they obviously

disagree as to the result that the Court should reach.  Plaintiff maintains that the Committee's decision was arbitrary and capricious for the following reasons: 1) the Committee did not properly evaluate the combined effect of his physical and mental conditions; 2) the Committee did not obtain physical and mental examinations of Plaintiff; 3) the Committee failed to consider Plaintiff's entire medical record, and instead, relied only on portions of the medical file; 4) the Committee failed to give appropriate weight to the SSA's finding of disability; 5) the Committee failed to have Plaintiff's mental health claim reviewed by an independent healthcare professional; and 6) the Committee failed to follow the Plan by allowing voting committee members to also serve as independent medical consultants.  In response, Defendant contends that its decision was not arbitrary or capricious, and must be affirmed.

The Court finds that remand is necessary because the Committee failed to follow the terms of the Plan in certain respects.  First, with regard to the leukemia claim, it appears that the Committee did not follow the Plan's requirements concerning a second appeal.  Specifically, the Court is referring to the following provisions of the Plan:

> Upon receipt of a second appeal, the Committee will conduct a full review of the claim file and any additional information submitted.  The claim decision will be made by the Appeals Review Unit.  The Appeals Review Unit would not have been involved in the initial benefit determination or in the first appeal and will not have been the subordinate of either the Plan Administrators or the Appeals Unit.

> If the first appeal was based in whole or in part on a medical judgment, the Appeals Review Unit will consult with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment, was not consulted in the initial adverse benefit determination nor in the first appeal and is not a subordinate of the healthcare professional(s) consulted in the initial adverse benefit determination and first appeal.

The Court finds that this language clearly means that the "healthcare professional" who is consulted cannot also be a member of the Appeals Review Unit.  In addition to being compelled by the plain language of the Plan, this interpretation is consistent with Defendant's actions at the two prior stages of review, in consulting Marciniak and Wortman, neither of whom was, as far as the Court can determine, a voting member of the committees that previously denied Plaintiff's claim.[6]  To the extent that Defendant interprets the Plan to allow the consulting healthcare professional to be a member of the committee deciding the claim, the Court concludes that such interpretation is arbitrary and capricious.

As for Plaintiff's claim based on depression and anxiety, it is clear that he did not receive the basic procedural protections granted to him under the Plan.  In that regard, Plaintiff's mental health claim was unusual in that it arose while the Committee was considering the second appeal on Plaintiff's leukemia claim.[7]  Because of that, and because the Committee denied the opportunity for further review, the Committee's final decision on Plaintiff's leukemia claim was also its first and only decision regarding the mental health claim.  Plaintiff therefore never had the opportunity to appeal that determination to the Committee or to further develop the record concerning his mental impairments and/or the combined effect of his physical and mental impairments.  Additionally, for the reasons discussed above, it was also error for Dalpe and Lisse to act as both independent

---

[6]Although, as mentioned earlier, the record does not identify the individuals who were involved in the prior decisions.

[7]Plaintiff faults the Committee for failing to evaluate his mental condition in the Committee's first two decisions.  However, the Court finds that the fault for that, if any, lies with Plaintiff, since he initially indicated only that he was seeking total and permanent disability benefits with regard to leukemia.  Nevertheless, once the Committee recognized that Plaintiff was also claiming to be totally and permanently disabled due to his mental conditions, it was required to follow the procedures set forth in the Plan.

healthcare professionals and voting members of the Committee. Accordingly, the Court concludes that remand to the Committee is appropriate to address these deficiencies.

As for Plaintiff's remaining arguments, Plaintiff maintains that the Committee acted arbitrarily and capriciously by failing to obtain independent mental and physical examinations. In support of this argument, Plaintiff cites *Westphal v. Eastman Kodak Co.*, No. 05-CV-6120, 2006 WL 1720380 (W.D.N.Y. Jun. 21, 2006) (Telesca, J.). In *Westphal*, the court reversed a plan's denial of benefits, after the plan administrator rejected the opinions of two treating doctors and a non-treating examining psychologist, all of whom indicated that the plaintiff was unable to work due to psychiatric problems, and instead relied on the contrary opinions of two doctors who had never examined the plaintiff. *Id.*, 2006 WL 1720380 at *3-4 (In a case involving a psychiatric disability determination, "it is an abuse of discretion to rely solely on [the opinions of non-treating, non-examining doctors], particularly in a case such as this, where the opinion of every physician who actually examined the plaintiff agreed that the plaintiff is disabled."). Plaintiff also cites *Morse v. Corning Inc. Pension Plan for Hourly Employees*, No. 05-CV-6318, 2007 WL 610628 (W.D.N.Y. Feb. 23, 2007) (Telesca, J.), in which a plan rejected a claim for long-term disability benefits by a claimant, who maintained he was disabled due to bipolar disorder, panic disorder and depression. The claimant's treating physician and social worker indicated that the claimant was totally and permanently disabled, however, the plan concluded otherwise, based on the evaluation of two non-treating, non-examining doctors. Both of the plan's consultants spoke with the claimant's doctor and reviewed the claimant's medical file. *Id.* at *3-4. The consultants concluded that the claimant was not totally and

permanently disabled, citing a lack of "documentation," "corroborative information," and "objective medical evidence." *Id*. at *3-5. The court, citing its earlier decision in the *Westphal* case, found that the plan's decision was arbitrary and capricious, reiterated that "it is arbitrary and capricious to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient." *Id*. at *8. One judge in the Southern District of New York subsequently declined to follow *Westphal* and *Morse*, observing that "[t]he categorical rules in those cases appear to be inconsistent with the rejection of the 'treating physician rule' in *Black & Decker* [*v. Nord*, 538 U.S. 822, 834 (2003)], and with the Supreme Court's citation with approval of the Department of Labor's view that ERISA is best served by 'preserv[ing] the greatest flexibility for . . . operating claims processing systems consistent with the prudent administration of a plan." *Gannon v. Aetna Life Ins. Co.*, No. 05 Civ. 2160 (JGK), 2007 WL 2844869 at *13, n. 6 (S.D.N.Y. Sep. 28, 2007) (Citation omitted).

Here, Plaintiff does not contend that the Plan's failure to conduct its own psychiatric examination of Plaintiff *necessarily* renders its decision arbitrary and capricious. Instead, Plaintiff argues that such failure is a significant factor in determining whether the decision was arbitrary and capricious. *See*, Plaintiff's Memo of Law at 18 ("Defendant's failure to conduct an 'in-person' psychiatric evaluation is a critical element in establishing an arbitrary and capricious denial."). Based on the specific facts of this case, the Court agrees. In that regard, the opinions of Qadeer and Thomassen, both of whom examined Plaintiff, are essentially consistent, in that they agreed that Plaintiff suffers from depression and panic disorder. Qadeer indicated that Plaintiff was unable to work, and although Thomassen did

not expressly make such a finding, he indicated that Plaintiff's claims of "psychiatric disability were somewhat consistent with [his] examination findings." (West 0090). On the other hand, the Plan's denial of the psychiatric portion of Plaintiff's disability claim was based primarily on the opinion of Dr. Dalpe, who never examined Plaintiff, and who reportedly indicated only that "there was insufficient information to support disability per plan language." (West 0029). That cryptic explanation was expanded somewhat in the Committee's denial letter, but not much. *See*, Final Denial Letter (West 0015) ("[The submitted medical records] do not support a total and permanent psychiatric disability. There is no objective data that supports a psychiatric disability. Submitted clinical records include your psychiatric history, but the more current mental health progress notes do not provide any data to support your inability to perform the essential duties of a job for which you are qualified.").[8] Dalpe made similar findings in the Case Report for Corning. (West 0354).

As discussed earlier, the Plan was required to provide Plaintiff with "the specific reason(s) for the denial" and "a description of any additional material or information necessary to perfect a claim and an explanation of why such information is necessary." That did not occur here. As for the latter requirement, that the Committee provide "a description of any additional material or information necessary to perfect a claim and an explanation of why such information is necessary," the Court interprets that to mean that the Committee cannot simply inform a claimant that his claim is being denied for lack of evidence, as

---

[8]As mentioned above, Qadeer's office notes from 2005 and early 2006 indicate that Plaintiff was still experiencing depression and anxiety. Accordingly, the Committee's statement that such notes fail to provide "any data" is puzzling.

happened here. Instead, for example, Dalpe should identify the type of "data" that would enable Plaintiff to establish his claim.

On remand, the Committee must follow the plan procedures, and then identify substantial evidence to support whatever decision it makes. In that regard, if the Committee again denies Plaintiff's claim, it would seem reasonable for the Committee to explain why it reached a determination that was different than that of the SSA. The Committee should also evaluate the combined effect of Plaintiff's physical and mental impairments.

## CONCLUSION

Defendant's motion for summary judgment (Docket No. [#9]) is denied, Plaintiff's cross-motion for summary judgment (Docket No. [#11]) is granted, and this matter is remanded to the Defendant Plan's Committee for further proceedings consistent with this Decision and Order.

SO ORDERED.

Dated:     Rochester, New York
           September 22, 2009
                                        ENTER:


                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge